IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Newport News Division

UNITED STATES OF AMERICA,

        Plaintiff,

v.                                     CRIMINAL ACTION NO. 4:17-cr-33

ADRIAN D. BRIGGS,

        Defendant.

*MEMORANDUM OPINION AND ORDER*

      This matter comes before the Court on a Motion to Suppress Photo Array Identification Evidence submitted by Adrian D. Briggs ("Defendant"). Having thoroughly reviewed the parties' filings in this case, the Court finds this matter is ripe for judicial determination. For the reasons set forth below, Defendant's motion is **DENIED**.

## I. FACTUAL AND PROCEDURAL HISTORY

      On Thursday, August 11, 2016, at approximately 4:30 a.m., Nathan Goodwin ("Victim") was sitting in his car in the parking lot of the Crestwood Suites hotel in Newport News, Virginia. According to Victim, a man ("the perpetrator") knocked on Victim's window and asked to use Victim's cell phone because he was stranded in the area. Victim exited the vehicle and gave the perpetrator his cell phone. Victim got back into his vehicle and allowed the perpetrator to make several calls. The perpetrator used the cell phone intermittently during the next 15-20 minutes. Between phone calls, the perpetrator made small talk with Victim, requested and received $4 for bus fare from Victim, and sat in the backseat of Victim's car at one point.

      Then, as the perpetrator was standing outside the car, Victim noticed a handgun in the

perpetrator's waistband. Alarmed by this, Victim told the perpetrator that he needed to leave to pick up his son. The perpetrator drew the handgun, told Victim to exit the car and leave his wallet inside, and then fled the area in Victim's car. Victim then ran inside the hotel and called the police.

When Victim spoke to police, he described the perpetrator as a Black male with "darker skin," clean shaven, no tattoos or scars on the face, with a short "edged up" haircut, wearing a white long-sleeved shirt. Victim said, "I'm 6'1 so he was a few inches shorter than me . . . 5'8 or 5'9." Victim also described the perpetrator as a "skinnier guy" in his late teens to early twenties. Victim's full statement is included as Exhibit 1 to Defendant's Reply in Support of the Motion to Suppress. *See* ECF No. 20, Ex. 1. Law enforcement personnel told Victim that, if and when they found his vehicle, they would ask Victim to identify the items in the car that did not belong to him because those items would likely be linked to the perpetrator.

Later that day, Victim's credit card was used at a 7-Eleven in Hampton, Virginia. There is video footage of a person getting out of the stolen vehicle and returning to the vehicle after the credit card was used. The next day, Friday, August 12, 2016, law enforcement officers found the vehicle in Hampton. They identified several items in the vehicle that did not belong to Victim. One of these items was a cigar wrapper. In October 2016, Detective Davis ("Det. Davis") of the Newport News Police Department received an email from the State Crime Lab informing her that the fingerprints on the cigar wrapper belonged to "Adrian Briggs". At some point thereafter, Det. Davis contacted Victim and asked him if he knew anything about the cigar wrapper in the vehicle or if he knew anyone named Adrian Briggs. Victim replied in the negative to both questions.

On November 3, 2016, Det. Davis asked Ms. Coner, a Crime Analyst with the Newport

News Police Department, to set up a photo array for a suspect named Adrian Briggs. Ms. Coner did not know any other information about Defendant or about the description Victim had given of the perpetrator. Ms. Coner conducted a search in the photo database using Defendant's name and received three search results. Ms. Coner testified that, under standard photo array procedure, she would include the most recent photo of a suspect in the array. However, in this case, the most recent photo of Defendant depicted him with an injured lip. Therefore, Ms. Coner testified that she used the next-most recent photo of Defendant.

To acquire the five "filler" photos necessary to complete the photo array, Ms. Coner then conducted a search in the photo database for all photos matching Defendant's race, sex, age (within 2 years) and weight (within 20 pounds). This search returned approximately 1,000 possible filler photos. Of these, Ms. Coner selected five for inclusion in the photo array. Ms. Coner testified that her goal in selecting these photos was to ensure that Defendant's photo was not unnecessarily or suggestively distinguishable from the filler photos. Of the six men in the photos, only two are wearing a white crew-neck shirt: Defendant and another man, whose crew-neck shirt is under a white collared shirt. All six photos are attached as Exhibit 1 to the Government's Response in Opposition to the Motion. *See* ECF No. 16, Ex. 1.

On December 1, 2016, Det. Davis took the six photos provided by Ms. Coner, placed each photo into a separate folder, shuffled the order of the folders, and then gave the folders to Detective Erickson ("Det. Erickson") of the Newport News Police Department. Det. Erickson did not know which of the photos belonged to Defendant. Later that day, Det. Erickson presented the photo array to Victim. Det. Davis was present in the room. Before giving the folders to Victim, Det. Erickson gave Victim the following nine admonishments:

1) The suspect may or may not be in the line-up;
2) The police will continue to investigate the incident regardless of whether identification

3

is made;
3) The line-up administrator does not know who the suspect is;
4) Individual photos will be viewed one at a time;
5) Photos are in random order;
6) Take as much time as needed in making a decision about each photo;
7) All photos will be shown, even if identification is made prior to viewing all photos;
8) If the suspect is seen in the line-up, he/she may not appear exactly the same as on the date of the incident because features such as clothing and head/facial hair can change; and
9) In a photo line-up, photos don't always depict the true complexion of a person, who might be lighter or darker than shown in the photo.

Det. Erickson then presented the photos to Victim, one at a time. When Victim saw Image 5 (the photo of Defendant), Victim stated, "That's him." Victim then wrote on Image 5, "This is the young man who robbed me at gun point on Aug. 11, 2016. I am 100% positive that this is the person." Victim then signed and dated this written statement on Image 5.

Two months later, in February 2017, Det. Davis was informed about another item that had been obtained from the vehicle that did not belong to Victim. This item had fingerprints belonging to Elijah Bullin. Det. Davis contacted Victim, who stated that he did not know Mr. Bullin.

On April 11, 2017, Defendant was indicted on 2 counts (Carjacking and Brandishing a Firearm During a Crime of Violence). On April 27, 2017, Defendant pled Not Guilty. The instant Motion to Suppress was filed May 18, 2017. A hearing was held on the motion on July 5, 2017.

## II. LEGAL STANDARDS

Courts must suppress evidence concerning an out-of-court identification if the procedures that led to that identification were "so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." *Simmons v. United States*, 390 U.S. 377, 384 (1968). "It is the likelihood of misidentification which violates a defendant's right to due

4

process." *Neil v. Biggers*, 409 U.S. 188, 198 (1972). "Suggestive confrontations are disapproved because they increase the likelihood of misidentification, and unnecessarily suggestive ones are condemned for the further reason that the increased chance of misidentification is gratuitous." *Id.*

However, "[a]n identification infected by improper police influence . . . is not automatically excluded. Instead, the trial judge must screen the evidence for reliability pretrial. If there is 'a very substantial likelihood of irreparable misidentification,' the judge must disallow presentation of the evidence at trial." *Perry v. New Hampshire*, 132 S. Ct. 716, 720 (2012) (quoting *Simmons*, 390 U.S. at 384) (emphasis added)).

The United States Court of Appeals for the Fourth Circuit ("Fourth Circuit") has adopted the following two-part test to determine the admissibility of an out-of-court identification:

> To determine whether identification testimony is admissible, a court must engage in a two-step process. First, the court must consider whether the identification procedure is unnecessarily suggestive. A procedure is unnecessarily suggestive if a positive identification is likely to result from factors other than the witness's own recollection of the crime. Second, if the procedure was unnecessarily suggestive, a court must look at several factors to determine if the identification testimony is nevertheless reliable under the totality of the circumstances. These factors include the opportunity of the witness to view the accused at the scene of the crime, the witness's degree of attention, the accuracy of the witness's prior description of the accused, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation.

*Satcher v. Pruett*, 126 F.3d 561, 566 (4th Cir. 1997) (citations omitted). Regarding the first step in this process, the defendant bears the burden of proving that the identification procedure was unnecessarily suggestive. *See Holdren v. Legursky*, 16 F.3d 57, 61 (4th Cir. 1994).

### III. DISCUSSION

#### A. Whether the Identification Procedures were "Unnecessarily Suggestive"

The first question for the Court is whether the identification procedures that resulted in

Victim choosing Defendant's photo were "unnecessarily suggestive." Defendant argues that these procedures were unnecessarily suggestive for 7 reasons.

First, Defendant argues that his was the only photo of the six in which the person was wearing only a white crew-neck shirt. While it is true that only Defendant is wearing a white crew neck-shirt by itself, the young man in Image 6 is also wearing a white crew-neck shirt under a white collared shirt. Also, the eighth admonishment given to Victim (i.e., "If the suspect is seen in the line-up, he/she may not appear exactly the same as on the date of the incident because features such as clothing and head/facial hair can change.") made it clear that the face should be his only focus when viewing the photo array.

As Ms. Coner testified, this admonishment is given because she cannot control the clothing or hair style that people have in the photos that are available to her. Ms. Coner also testified that she was only given Defendant's name when she was asked to create a photo array. Therefore, even if she could control the clothing or hair style that appear in the photos, she could not have known that Victim had described the perpetrator as having short hair or wearing a white shirt. The fact that the photo of Defendant in the photo array depicted him with short hair and a white shirt is simply a coincidence and is not the result of any suggestion on the part of law enforcement. The Court finds that Defendant's white shirt did not render the identification procedure unnecessarily suggestive.

Second, Defendant argues that only three of the photos in the array (including Defendant's photo) featured clean shaven men (which is how Victim described the perpetrator). The Court finds that all six of the men in the photo array are clean shaven, notwithstanding the shadows cast on some of the faces in the array. Even if Victim had mistaken any of these shadows for light facial hair, that same eighth admonishment referenced and explained above

6

made it clear that the face should be his only focus when viewing the photo array. The Court finds that Defendant's clean shaven appearance did not render the identification procedure unnecessarily suggestive.

Third, Defendant argues that an older booking photo of Defendant was used in the array, rather than one that was taken closer to the time of the incident. Again, Ms. Coner testified that she used the second-most-recent photo of Defendant available to her because the most recent photo depicted Defendant with an injured lip. According to Ms. Coner, this is standard procedure. The Court finds that such a procedure is reasonable and that the use of Defendant's second-most-recent photo did not render the identification procedure unnecessarily suggestive.

Fourth, Defendant argues that law enforcement statements to Victim before the day of the photo array likely gave Victim the impression that the suspect would be in the photo array. The first of these statements occurred on the day of the incident when law enforcement told Victim that, if and when they found his vehicle, they would ask Victim to identify the items in the car that didn't belong to him because those items would likely be linked to the Perpetrator. The second statement occurred when Det. Davis called Victim and asked Victim if he had knowledge of the cigar wrapper found in the vehicle or of a person named Adrian Briggs. Defendant argues that these two statements, taken together, gave Victim the impression that police had located a suspect that would likely be in the photo array.

While these statements may have suggested to Victim that the photo array would likely contain a suspect, the Court does not find that this rises to the level of unnecessary suggestiveness. The first admonishment given to Victim (i.e., "The suspect may or may not be in the line-up") may have removed any suggestiveness that may have resulted from those statements. Also, any suggestiveness resulting from these statements would not have indicated

that Defendant's photo was the suspect – only that a suspect would likely be in the array. Furthermore, it was necessary for law enforcement to ask Victim about the cigar wrapper in order to ascertain whether the fingerprints found on it belonged to an acquaintance of Victim. As the detectives testified, it would have been a waste of time and resources for them to investigate someone who was already known to Victim. Therefore, the Court finds that the statements law enforcement made to Victim, while possibly suggestive that a suspect was likely in the array, were not unnecessarily suggestive. In other words, Victim's identification of Defendant's photo did not "result from factors other than the witness's own recollection of the crime." *Satcher*, 126 F.3d at 566.

Fifth, Defendant states that it is "bothersome" that Victim selected Defendant's picture out of the photo array, given the fact that Defendant is only between 5'3" – 5'5" (not 5'8" or 5'9", as Victim had described the perpetrator on the day of the incident). The Court finds that this argument is immaterial to the question of suggestiveness because the photo array contained only headshots, making height irrelevant in the identification process. This argument is more appropriate for the second part of the *Satcher* test (i.e., the "totality of the circumstances" analysis). This will be discussed in Section B below.

Sixth, Defendant argues that law enforcement never showed Victim a photo array containing Mr. Bullin, despite the fact that his fingerprints were found on an item in the car and the fact that he is closer in height to Victim's description of the Perpetrator. The Court finds that this argument is immaterial to the question of suggestiveness. The fact that law enforcement did not conduct a second photo array for a different person had no impact on the suggestiveness of the first photo array.

Finally, Defendant argues that the photos in the array "consist of light-to-brown-skinned

8

individuals when in fact [Victim] had stated that the suspect was 'darker skinned' as opposed to 'brown skinned.'" Defendant argues that law enforcement purposely chose five photos of men with light-to-brown complexion just to blend them in with Defendant's complexion, despite the description that Victim had given on the day of the incident.

Again, Ms. Coner testified that she was only given Defendant's name when she was asked to create a photo array. Therefore, she had no knowledge of Victim's description of the perpetrator. Ms. Coner testified that she chose the other five photos in the array so that they would blend in with the photo she found of Defendant; she did not choose any photos based on Victim's description. Therefore, the Court finds that the complexion of the individuals in the photo array did not render the identification procedure unnecessarily suggestive.

The Court finds that Defendant's arguments, whether analyzed individually or together, do not satisfy Defendant's burden of proving that the identification procedures that led to Victim's positive identification of Defendant's picture were unnecessarily suggestive. In other words, the photo array was not unnecessarily suggestive. Therefore, the Court could end its inquiry here. However, in the interest of providing a thorough and complete analysis of this issue, the Court will address the second part of the *Satcher* test and explain why the identification was reliable under the totality of the circumstances.

## B. Whether the Identification was Reliable under the Totality of the Circumstances

The second step in the *Satcher* test requires a court to weigh five factors to determine if the out-of-court identification is reliable under the "totality of the circumstances." *Satcher*, 126 F.3d at 566. Each factor will be discussed below.

First, the Court must consider the opportunity of the witness to view the accused at the scene of the crime. During Victim's initial interview on the day of the incident, Victim stated, "I

could make his face out . . . [We interacted] for about a good twenty minutes roughly . . . [at] one point we were probably two-three feet apart . . . and there is a light out there so I did see his face." ECF No. 20, Ex. 1 at 7-8. During that same interview, Victim described with clarity the perpetrator's clothing and appearance. *Id.* at 6-8. Therefore, the Court finds that Victim had a good opportunity to view the perpetrator at the scene of the crime. This increases the reliability of Victim's identification.

Second, the Court must consider the witness's degree of attention at the time he claims to have seen the accused. Again, Victim's initial interview shows that Victim was highly attentive to the perpetrator throughout their interaction, including the initial request to use Victim's phone, the ensuing small talk, the request for bus fare, the second request to use the phone, more small talk while the perpetrator sat in the backseat of the vehicle, Victim's attempt to leave, and Victim being held at gunpoint. *See id.* at 1-12. During his interview, Victim was able to repeat many statements perpetrator made, both to him and to others on the phone. As stated previously, Victim was also able to describe with clarity the perpetrator's clothing and appearance, including his jewelry, belt, and firearm. Therefore, the Court finds that Victim had a high degree of attention at the time he viewed the perpetrator. This increases the reliability of Victim's identification.

Third, the Court must consider the accuracy of the witness's prior description of the perpetrator as compared to the accused. During his initial interview, Victim described the perpetrator as a clean shaven black male with "darker skin." *Id.* at 8. Victim stated that he had a short haircut. *Id.* at 6. Victim also stated that he was skinny and appeared to be in his late teens to early twenties. *Id.* at 15. Victim described the perpetrator's height as "a few inches shorter than me." *Id.* at 14. Victim stated that he is 6'1" tall, and therefore estimated that the perpetrator

was 5'8" or 5'9". *Id.*

Victim described the perpetrator as having "darker skin." However, when the detective asked Victim whether the perpetrator's complexion was lighter or darker than that of another law enforcement officer present during the interview, Victim said "[the perpetrator] was a little bit lighter." Due to the relative and subjective nature of these descriptions, the Court cannot assess the accuracy of Victim's statements regarding the perpetrator's complexion as compared to Defendant. Defendant appears to match most of the other descriptors Victim gave of the perpetrator. Indeed, Defendant appears to be a clean shaven skinny black male in his late teens or early twenties with a short haircut.

The one descriptor that does not match is height. While Victim estimated the perpetrator's height to be around 5'8" or 5'9", Defendant's height is in the 5'3" – 5'5" range. The government argues that this disparity may be due to the fact that Victim was seated in his vehicle during the majority of his interaction with the perpetrator. The government also notes that the remaining descriptors given by Victim were accurate as compared to Defendant. The Court finds that Victim's description of the perpetrator, as compared to Defendant, was only somewhat accurate. In the Court's analysis, this neither increases nor reduces the reliability of Victim's identification.

Fourth, the Court must consider the level of certainty demonstrated by the witness when he identified the defendant in the photo array. According to the detectives' testimony, when Victim saw Image 5 (the photo of Defendant) in the photo array, Victim stated, "That's him." Victim then wrote on Image 5, "This is the young man who robbed me at gun point on Aug. 11, 2016. I am 100% positive that this is the person." *See* ECF No. 16, Ex. 1 at 3. Victim then signed and dated this written statement on Image 5. *See id.* Therefore, the Court finds that

11

Victim demonstrated a high level of certainty when he identified Defendant in the photo array. This increases the reliability of Victim's identification.

Fifth, the Court must consider the length of time between the crime and the out-of-court identification. Defendant argues that the length of time between the crime (August 11, 2016) and the photo array identification (December 1, 2016) is enough to cast doubt on the reliability of the identification. The government concedes that this length of time "weighs slightly against the reliability of the identification." ECF No. 16 at 17. Nevertheless, the government argues that the date of the identification "was not too remote as to cause the victim's identification of the Defendant to be unreliable when reviewed upon a totality of the circumstances." *Id.* The government cites *Neil v. Biggers* in support of its argument. *Id.*

In *Neil v. Biggers*, the United States Supreme Court ("Supreme Court") confronted a case in which a rape victim had made an out-of-court identification of the defendant almost seven months after the rape had occurred. *Neil*, 409 U.S. at 195. During those seven months, law enforcement had shown the victim between 30 and 40 photographs and had conducted in-person line-ups for the victim, but the victim had never identified anyone before the defendant. *Id.* at 194-95. The Supreme Court held that, although seven months would ordinarily weigh heavily against the reliability of an identification, the fact that the victim had not made any prior identifications showed that "[h]er record for reliability was thus a good one." *Id.* at 201. Ultimately, the Supreme Court found the identification to be reliable under the totality of the circumstances. *Id.*

Here, Victim identified Defendant nearly four months after the crime, which is a shorter amount of time than had elapsed in *Neil*. However, Victim did not view dozens of photos or multiple line-ups before identifying Defendant; Victim identified Defendant during the first

photo array he saw. Therefore, Victim did not have the same "record for reliability" that was described in *Neil*. The Court finds that a four-month gap between the crime and the identification jeopardizes the reliability of the identification, especially in the absence of the type of "record for reliability" described in *Neil*. As the government conceded, this weighs slightly against the reliability of the identification.

Upon weighing the aforementioned five factors, the Court finds that the Victim's identification of Defendant during the administration of the photo array is reliable under the totality of the circumstances surrounding the crime and the identification. In other words, the Court finds "no substantial likelihood of misidentification." *Id.*

## IV. CONCLUSION

For the reasons set forth above, Defendant's Motion to Suppress Photo Array Identification Evidence is **DENIED**.

The Court **DIRECTS** the Clerk to send a copy of this Order to the parties.

**IT IS SO ORDERED**.

Norfolk, Virginia
July  14 , 2017

/s/
Raymond A. Jackson
United States District Judge

13